IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CARL T. HARRIS,

                    Plaintiff,                    OPINION & ORDER

    v.

                                        12-cv-437-wmc

SGT. ERIC BILLINGTON, TODD RUSSELL,
WAYNE BAUER, DR. CHARLES GRISDALE,
DR. JEFFREY GARBELMAN and AMY RADCLIFFE,

                    Defendants.

Plaintiff Carl T. Harris was granted leave to proceed on claims that six employees at Waupun Correctional Institution ("WCI") acted with deliberate indifference to his serious mental health needs. More specifically, Harris claims that despite being aware of the serious risk that he would harm himself, the defendants failed to protect him from himself on April 12, 2012, and then denied him adequate mental health care. Harris has moved for summary judgment on his claims against all defendants. (Dkt. ##54, 89.) Defendants Amy Radcliffe, Dr. Jeffrey Garbelman, Dr. Charles Grisdale and Captain Wayne Bauer have also moved for summary judgment on all alleged claims against them. (Dkt. ##58, 95.) For reasons explained below, the court will deny all of the dispositive motions in their entirety, except as to Dr. Garbelman, who will be granted summary judgment in his favor.

UNDISPUTED FACTS

## I.    Preliminary Matters

Defendants filed proposed findings of fact to support their own motion for partial summary judgment (*see* dkt. #60), but failed to respond to Harris's proposed findings of fact in support of *his* motion for summary judgment. This failure is understandable, at least in

part, given Harris's own failure to comply with the court's procedures on summary judgment. Instead of filing his proposed findings of fact "[i]n a separate document" from his motion, Harris filed the two together. (*See* Mot. Summ. J. & Proposed Findings of Fact (dkt. #54).) Harris nevertheless urges the court to deem his proposed findings of fact undisputed due to defendants' failure to respond (Pl.'s Reply (dkt. #71) 1-2). Defendants, for their part, appear to believe Harris did not file *any* proposed findings of fact. (Defs.' Br. Opp'n (dkt. #70) 2-3.)

The Seventh Circuit has repeatedly reaffirmed that district courts may enforce their local rules strictly to promote the clarity of summary judgment filings. *See, e.g.*, *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011). However, "the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." *Id.* at 887 (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)). Here, both sides are guilty of procedural error, yet neither is fatal to the court's ability to parse the summary judgment materials. Accordingly, the court will ascertain the undisputed facts based on the formal findings of fact submitted with defendants' motion for summary judgment and citations to evidentiary materials contained in the parties' briefs.

## II.    The Parties

Plaintiff Carl Harris was a Wisconsin state prisoner confined at WCI at all times relevant to the complaint in this case. Defendants Eric Billington and Todd Russell are correctional officers with the Wisconsin Department of Corrections ("DOC"). At all relevant times, they were assigned to WCI -- Billington as a Sergeant and Russell as a "Correctional Officer II."

2

Defendant Amy Radcliffe has been employed by the DOC as a Nurse Clinician in the WCI Health Services Unit ("HSU") since August 14, 2011.  She has been licensed as a Registered Nurse in Wisconsin continuously since February 21, 2007.  Her responsibilities at HSU include:  patient assessment and treatment; assisting physicians; management of medications; provision of emergency care; and maintenance of medical records.

Defendant Dr. Charles Grisdale, Ph.D., is a psychologist licensed to practice in Wisconsin.  From May of 2006 until June 30, 2012, he was employed by the DOC to serve in the position of "Psychologist – Licensed" at WCI.  His duties at WCI included: performing mental health screenings; conducting brief individual counseling and mental health monitoring; and providing crisis intervention and prevention, individual psychotherapy and psychological assessments.  On July 1, 2012, Dr. Grisdale became the Chief Regional Psychologist for Region 2 of the Division of Community Corrections with the DOC, a position he held until April 1, 2014.  At all times relevant to this matter, Dr. Grisdale was Harris's assigned primary clinician.

Defendant Dr. Jeffrey Garbelman, Ph.D., is also a psychologist licensed to practice in Wisconsin. He was employed by the DOC as a "Psychologist Supervisor" at WCI from December of 2010 until September of 2012, when he left state service.  Under the general supervision of the WCI Deputy Warden, Dr. Garbelman was responsible for the overall administration of the Psychological Services Unit ("PSU") at WCI and was the point of contact for inmates dissatisfied with their assigned primary clinicians.  In that position, Garbelman had authority over the development, administration and coordination of all psychological programs within the unit, including staff supervision, service provision, consultation and support activities.  Garbelman also provided psychological services to

offenders; made recommendations for institutional programming; assisted in providing training to staff; and participated with other PSU staff in structured case conferences and staffing.  Dr. Garbelman rejoined state service in December of 2012, as a "Psychologist – Licensed" at Columbia Correctional Institution ("CCI").  After a year in that position, Garbelman moved to his current post as the DOC's Crisis Intervention Partner Program Coordinator and Psychological Staff Trainer.

Defendant Wayne Bauer has worked for the DOC since March 16, 1998, and has been employed as a "Correctional Supervisor 2" or "Captain" at WCI since June 19, 2011. Bauer's duties include:  assisting and instructing staff in their work; evaluating their performance; providing direction during emergencies; ensuring staff perform proper security practices; supervising mass movement; responding to inmate interview requests; and providing direction to inmates.

### III.    Accessing Medical and Psychological Services

### A. Medical Services

When inmates enter WCI, they receive an inmate handbook informing them that if they require non-emergency medical attention, they must submit a Health Services Request ("HSR") to the HSU.  Nursing staff triage the HSRs daily and schedule inmates to attend "sick call" if the stated problem requires medical attention.  Sick call takes place every weekday.  At sick call, nurses determine if the patient should be seen by a doctor by making focused assessments, providing treatment and scheduling for follow-up according to approved protocols and clinical priorities.

In contrast, if an inmate at WCI believes he needs to be seen immediately for an urgent medical need, he is supposed to contact housing unit staff using his emergency call

4

button.  Control center staff then notify HSU via telephone, and registered nurses perform a telephone triage to determine whether the patient should be seen at sick call.  Inmates always have the ability to request medical assistance, regardless of their status within WCI. For example, an inmate may request medical assistance even if he is in control or observation status.  Whenever a patient reports a significant problem or concern to HSU staff, the staff member is to note the problem in the patient's chart.  In general, Harris was seen regularly by the HSU staff.  They responded as needed to his condition on each occasion and sought lab work, tests and specialty consultation for Harris as needed.

### B. Psychological Services

WCI employs psychologists and psychological associates to offer mental health services consistent with an inmate's identified level of mental health needs, as established by standards set forth by Wisconsin DOC policies and procedures.  Clinical monitoring is one such service: it is a designated process that assigns the frequency of clinical contacts based on an inmate's assigned mental health classification.  Generally, inmates on clinical monitoring are seen a minimum of every three to six months, depending on their symptoms, needs and degree of mental illness.  Because every inmate has different needs, however, some inmates might be seen more often than the minimum of once every three months. Inmates may be seen in a variety of settings, including within their assigned unit.

Psychological staff members also conduct routine "rounds" in the segregation units by going to the cell front and talking to the inmates.  Generally, rounds occur every week, but psychological staff may see an inmate at the cell front more frequently if a staff member or the inmate requests it.

The inmate handbook that inmates receive upon arriving at WCI informs them how to access both psychological and medical care. For non-emergency psychological attention, inmates must submit a Psychological Services Request ("PSR") to the PSU; staff triage the PSRs daily and schedule inmates for an appointment if the stated problem requires attention. The level of risk and need determines the level of intervention. Additionally, policy and standard practice require that this correspondence be routed both to the staff members responding to crisis intervention that day and to the inmate's primary clinician.

For crisis issues presenting imminent risk to self or others, staff usually respond on the same day the reports are reviewed. Inmates are told that if they require crisis intervention due to suicidal thoughts, or if they pose an imminent risk to themselves or others, they should contact security immediately. Based on institution policy and standard practice, security would not contact the PSU supervisor upon receiving such a report; instead, they would contact the clinician handling crisis intervention that day or the assigned clinician.

## IV.   The April 12 Incident

### A. Interaction with Staff Before Self-Harm

On April 12, 2012, at approximately 9:00 P.M., Harris claims he pressed the emergency call button in his cell and advised defendant Todd Russell that he was suicidal. According to Harris, Russell then contacted defendant Eric Billington, who arrived at approximately 9:05 P.M. Harris reports showing Billington six pieces of metal and telling Billington that he intended to swallow them. Allegedly, Billington replied, "I don't see anything and I can't hear you." Harris claims that after telling Billington a second time that

6

he was suicidal, Billington replied, "I'm going home.  I don't care what you do."  Billington then walked away, leaving Harris alone.

After Billington left, Harris banged his head and face against the cell door and wall.  According to Harris, he then pushed the emergency call button again to inform Russell that he was bleeding, but Russell failed to respond.  Harris claims he also enlisted other inmates to push their own emergency call buttons, but Russell ignored those calls as well.  Finally, Harris claims he and the other inmates began to yell for staff assistance.  Although they received no reply, Harris heard the laughter of the officers.

Not surprisingly, defendants' version of events differs from Harris's significantly.  According to Billington, Harris *never* informed him that he was feeling suicidal on April 12, nor did he threaten to swallow six pieces of metal.  Billington also maintains that, to the best of his recollection, he was never present at Harris's cell door on that date.  (*See* Ex. 2 (dkt. #57-1) ECF 7-8.)  Like Billington, Russell claims to have had no knowledge of Harris's despondent state.  He denies that Harris or any other inmate pressed his emergency call button on the night of April 12.  (*See* Ex. 3 (dkt. #57-1) ECF 14-16.)  Thus, according to defendants Billington and Russell, Harris provided no warning before he began to injure himself on April 12.

## B.  Cell Extraction

Although the parties dispute whether he actually passed out, Harris became dizzy after violently banging his head against the cell door and wall.  Harris contends that after returning to consciousness, he realized no one had been to check on him and became despondent.  In contrast, defendants point to later examination notes indicating that Harris

never lost consciousness.  Regardless, the parties agree that following Harris's acts of self-harm, he sat down on the floor, wrapped himself in a blanket and tied a sheet around his neck.

Sergeant Schilling, who is not a defendant in this action, discovered Harris in that condition during the third shift after he spotted the bloodied windows of Harris's cell. Schilling asked Harris what was wrong and whether he was hurt, but he received no response.  Harris contends that he was non-responsive due to mistreatment at the hands of the second shift staff, while defendants dispute that staff members mistreated Harris at any time.

Defendant Wayne Bauer was working as a third-shift captain at WCI on April 12. At about 10:15 P.M., he responded to the segregation unit after learning that there was blood on Harris's cell windows and Harris was covered with a blanket.  When he arrived, he asked Harris to come to the door so he could be restrained, but Harris responded only that Captain Bauer should "ask second shift why this is happening."  For several minutes, the segregation sergeant and Captain Bauer tried to talk Harris into coming to the door, but he refused to comply.  Captain Bauer, denies seeing the sheet around Harris's neck.

Captain Bauer eventually determined it was necessary to remove Harris from his cell for his own safety, because: (1) staff could not tell where the blood on Harris's cell window had come from; (2) Harris had covered his face; and (3) Harris refused to come to the door voluntarily.  Accordingly, Bauer assembled a "pad subduing team" to perform an involuntary extraction.  The team consisted of:  (1) an onsite supervisor, who ensures the proper amount of force is used to maintain control; (2) a camera operator; and (3) at least four staff members wearing protective equipment.  Captain Bauer escorted the team to

8

Harris's cell.  He then told Harris that the team had assembled and showed him a sample arc of the Ultron II Handheld Electronic Control Device through the window.  After this demonstration, Captain Bauer again ordered Harris to come to the door, as did the team leader.  Harris still refused.

While trying to communicate with Harris, Captain Bauer noticed that Harris had placed a towel over the top of his head, a towel over the front of his face, and a blanket around him.  Eventually, Harris also pulled a mattress over himself so he was completely covered.  In response, Captain Bauer dispensed a one-second burst of OC from his OC fogger.  It landed on the mattress, and Bauer once again ordered Harris to come to the door to be restrained.  When Harris continued to ignore this directive, Bauer dispensed a second burst of OC fogger.  After that, Harris came to the door and allowed himself to be restrained.

When asked where the blood came from, Harris said he had hit his face and nose on the wall and smeared blood from his nose on the windows, although his nose did not appear to be bleeding at the time.  His clothing was removed, and the officers conducted a strip search without incident.  Captain Bauer noted that Harris had put on several layers of extra clothing under his segregation clothes and wrapped a bed sheet around his waist beneath his underwear, as if for additional padding.  He also saw the bloody windows and heard Harris tell various officers that he had banged his head against the wall and door.  Therefore, there is no dispute that Captain Bauer was aware Harris had engaged in an act of self-harm.  (*See* Defs.' Resp. PPFOF (dkt. #100) ¶ 11.)  Harris was then escorted to HSU.

### C. Radcliffe's Treatment of Harris

That same day, defendant Amy Radcliffe was called to assess Harris's injuries. Harris told Nurse Clinician Radcliffe that he had slammed his head against the wall. The parties dispute the remainder of their conversation. Harris claims he told Radcliffe that he was suicidal and needed to be placed on observation. In contrast, Radcliffe claims that rather than express any further suicidal ideation, Harris only stated that his acts of self-harm had been a "suicidal gesture."

During the ensuing physical exam, Radcliffe found that Harris had bruising over his nasal bridge and dried blood in the bilateral nare, but no active bleeding. She also found Harris's cranial nerves were grossly intact, but noted a septal deviation to Harris's left nostril and a history of previous fractures. Harris claims that Radcliffe also said that (1) his nose was "possibly fractured" and (2) he would experience pain.

Since her "multisystem assessment" was negative, the treatment that Radcliffe rendered consisted of reassurance and education. Radcliffe did not refer Harris to an advanced care provider because she did not believe any further follow-up was necessary based on her exam. Radcliffe testified further that based on her assessment, she concluded that Harris was not at imminent risk of further self-harm after her April 12 examination. Harris obviously disputes this since he claims to have told Radcliffe that he was suicidal and needed to be placed in observation status.

Radcliffe's notes indicate that Harris *was* placed in observation following her exam. (*See* Amy Radcliffe Decl. Ex. 101 (dkt. #63-1).) An inmate may be placed in observation status by a PSU clinician, crisis intervention worker, physician, registered nurse, physician's assistant, or the warden when the inmate threatens or engages in self-harming behavior.

10

Thus, Radcliffe had the authority to place Harris on observation even if he had not reported, or she had not credited, his plan to engage in further acts of self-harm.  If no clinician, crisis intervention worker or physician is available for consultation, the security director or shift captain may also place the inmate into observation status.

Observation is a very restrictive status, used to prevent an inmate from harming himself or someone else.  All property that an inmate could possibly use to harm himself is removed.  Observation status requires that an inmate be examined by a clinician, crisis intervention worker or physician, including a direct physical evaluation and a review of recent relevant information.

Radcliffe testified that she believed her notes to be correct, although Harris claims he overheard Radcliffe ask Captain Bauer about placing him in observation, to which Captain Bauer purportedly responded that Harris was going to be placed in control status.[1]  In fact, however, Radcliffe's notes appear to have ultimately been inaccurate, since Harris was actually placed in control status by security staff after she examined him.

Observation and control status are similar, but there are some differences.  For instance, control status placements are not clinical decisions and do not involve clinical input.  In fact, PSU is not notified of an inmate's placement in control status as a matter of policy or standard practice.  Rather, control status is a security status.  Inmates in control status are monitored regularly by security staff, with checks every half hour.  Captain Bauer has testified that he made the decision to place Harris in control status based on the

---

[1] Specifically, according to Harris, Captain Bauer said, "He's going into control.  There's no need for observation.  He hasn't cut on himself or anything like that."  Harris also says that Captain Bauer stated, "Put him on control status.  I don't see any evidence of suicidal behavior."  Radcliffe allegedly responded, "Are you sure?" and Captain Bauer answered, "Yeah, he looks fine to me."

situation at hand, pointing out that Harris never harmed himself during the time Captain Bauer was observing him and that staff were unable to verify that Harris had in fact banged his head on the wall.

Harris neither contacted Nurse Radcliffe nor told her before engaging in his self-injurious behavior that he wanted to speak with a psychologist or a PSU staff member, nor did he request as such during or after her assessment of his injuries. To Radcliffe's knowledge, Harris did not engage in any further self-harming behavior on April 12 or the next day, April 13.[2]   He was not seen by a clinician or crisis worker when released from control.

### D. Involvement of Psychological Staff on April 12

Harris never contacted Drs. Grisdale or Garbelman, nor did he inform them that he was feeling suicidal before he harmed himself on April 12. Unit staff also did not contact Dr. Grisdale or Dr. Garbelman that day to advise that Harris was requesting to be seen by PSU staff or that he had engaged in self-harming behavior. Neither doctor was on the segregation unit at the time, although Dr. Grisdale was the on-call clinician.

In particular, Dr. Garbelman had *no* knowledge that Harris was placed on control status after the incident of April 12. In fact, no one contacted Dr. Garbelman at all with respect to Harris's situation on April 12, nor was Dr. Garbelman involved in any way in making decisions about Harris that day. Dr. Garbelman was also not Harris's primary clinician, nor did he handle on-call after hours duties. In fact, Harris concedes that it was not until April 25, 2012, that he wrote to Dr. Garbelman to inform him of the April 12

---

[2] Harris does indicate that he became reclusive and non-responsive the next day, April 14, but it does not appear he engaged in any self-harm at that time. (Pl.'s PFOF (dkt. #54) ¶ 21.)

incident and of Dr. Grisdale's claimed failure to respond to Harris's requests.  (*See* Pl.'s Resp. DPFOF (dkt. #67) ¶ 79; Decl. of Carl Harris (dkt. #69) ¶ 18.)

## V.      Harris's PSR on April 13

The next day, April 13, 2012, Harris submitted a PSR, alleging that on the 12th he told Sgt. Billington he was suicidal and showed him six pieces of metal he intended to swallow.  Harris further alleged in the PSR that Sgt. Billington did nothing.  Finally, Harris claimed that he began to bang his head against the door in response to Billington simply walking away.

HSU received and triaged the PSR on April 14, 2012, and told Harris that "security [had been] notified [and] [i]nstructed to place in OBS."  The parties dispute whether Dr. Grisdale ever received or reviewed this PSR.  Harris acknowledges having no direct evidence that Dr. Grisdale saw the PSR, but points out that PSRs are triaged daily, *and* that standard prison practice dictated such correspondence be routed to the staff responding to crisis intervention that day, as well as to the inmate's primary clinician.  Since Dr. Grisdale played both of those roles, Harris argues that there exists a genuine dispute of fact as to whether Grisdale saw the April 13 PSR.

## VI.      Psychological Services Following the PSR

On April 17, 2012, PSU psychologist Dr. Leslie Baird met with Harris.  Dr. Baird had once been Harris's primary clinician.  As a result, she knew his mental health background and had built a rapport with him.  During their April 17th discussion, Harris claims he informed Baird that he was feeling depressed and more suicidal lately, and that he needed to see his primary clinician.  Defendants dispute this, pointing out that Dr. Baird's

records indicate Harris actually *denied* suicidal ideation on April 17.  (*See* Jeffrey Garbelman Decl. Ex. 105 (dkt. #61-1) 000036.)

On April 23, 2012, Dr. Baird again saw Harris.  She noted that during this visit, Harris once again denied suicidal ideation, but wanted to be seen by his primary clinician.  Baird further noted Harris complained about the handling of observation placements.  In response, Baird advised Harris to submit a complaint.  Apparently, Dr. Baird met with Harris at least twice more; Harris's uncontradicted declaration states that each of those meetings lasted approximately three to five minutes.

On April 25, 2012, Harris wrote to Dr. Garbelman as Dr. Baird suggested.  Defendants purport to dispute this fact but offer no evidence crating a genuine dispute.  (*See* Defs.' Resp. PPFOF (dkt. #74) ¶ 33.)   In that correspondence, Harris claims he informed Dr. Garbelman of the incident on April 12, and he further complained that Dr. Grisdale failed to respond to his requests to be seen.  Harris also sought Dr. Garbelman's help in getting Dr. Grisdale to see him.  According to Harris, Dr. Garbelman neither acknowledged his correspondence nor responded to it in any way.

Harris also alleges that he asked Dr. Baird if he could see Dr. Grisdale four times (April 17, 23, and 30 and May 7), citing to a "Health & Psychological Rounds in Segregation/Security Log."  (*See* Jeffrey Garbelman Decl. Ex. 105 (dkt. #61-1) 000036.) That log indicates that Harris asked to see his clinician on four separate occasions – but the first such occasion was during the April 23rd meeting, with the other requests occurring on April 30, May 7 and sometime in June.  (*See id.*)  Thus, the log provides no support for Harris's assertion that he asked to see Dr. Grisdale on April 17.  Harris also cites to his own

14

declaration, however, as evidence that he asked to be seen by Dr. Grisdale during the April 17 meeting with Dr. Baird.  (*See* Harris Decl. (dkt. #69) ¶¶ 12-13.)

Dr. Grisdale never conducted any mental wellness rounds in April or May of 2012. On May 8, 2012, however, Dr. Grisdale did see Harris out-of-cell for "clinical monitoring follow-up."  Harris reported dreaming of "falling out of a tree in a free-fall (w/o stopping) and waking up in a sweat with a puddle of sweat on [his] chest."  He observed that this was the first time he had experienced such a sensation, but that it was occurring more frequently.  Harris also recalled the loss of a close friend, who had been shot and apparently died in his arms.  Dr. Grisdale discussed with Harris his dreams and family mental health history.  Harris reported having a maternal grandmother, mother and aunt with "psychiatric" or "crazy" mental issues.  Harris also noted his prior, limited mental health history, indicating that he had at one time taken Fluoexetine, Trazodone and Amitriptylene, as well as Prozac for antidepressive complaints, but that he had since discontinued those medications.

During the May 8 meeting with Dr. Grisdale, Harris discussed his behavior, which had resulted in several observation placements on a Saturday evening.  Harris also talked about having engaged in a series of behaviors in which he announced suicidal feelings or a desire to harm himself.  First, he discussed the April 12 incident, claiming that he had pushed the emergency button in his cell, but that the sergeant who responded failed to assist him and said that he was going home.  Dr. Grisdale noted that the veracity of Harris's comments was unknown and then explained the on-call process to Harris.

Harris contends that during this session, he asked why Dr. Grisdale failed to respond to his various attempts to contact him.  According to Harris, Dr. Grisdale responded that

15

with budget cuts and an excessive caseload, he "didn't have time to babysit every inmate with emotional problems." Defendants dispute this fact, pointing again to their version of events in which Dr. Grisdale received no complaints from Harris between April 12, 2012 and April 23, 2012.

Ultimately, Dr. Grisdale found Harris cooperative and appropriate. He also found that his mental status evaluation was within normal limits. Dr. Grisdale noted that Harris was open to a referral to a WCI psychiatrist, which he was "happy to oblige." Based on the evaluation, Dr. Grisdale continued his previous mental health diagnoses of Axis II Antisocial Personality Disorder and Mental Health Code as MH-O (no mental health need). Grisdale made a plan to refer Harris to psychiatry, scheduled a follow-up meeting pending review and gathered some in-cell reading materials on relaxation and stress management for Harris to review. Throughout this period, PSU staff continued to monitor Harris's psychological needs.

MOTION TO STRIKE

Harris has asked the court to strike the declaration of WCI Security Director Anthony Meli, arguing that Meli has now presented two separate sworn statements that contradict one another. (*See* dkt. #51.) The declarations relate to missing video footage, which Harris contends would have shown defendant Billington at his cell door on the night of the incident. Meli offered a declaration, dated May 30, 2014, in which he stated that he reviewed Harris's allegations, viewed the footage and responded that Billington had not, in fact, been present at Harris's cell. In that declaration, Meli also declared that he "did not consult Sergeant Billington or any other party to this action before making [his] response."

16

(May 30, 2014 Anthony Meli Decl. (dkt. #48) ¶ 10.)  In an earlier declaration, however, Meli stated that he had responded to Harris's request "[a]fter reviewing the video *and speaking with Sgt. Billington*."  (Apr. 17, 2014 Anthony Meli Decl. (dkt. #35) ¶ 18 (emphasis added).)

The court ordered briefing on the request to strike.  Defendants now respond that while the declarations admittedly contradict one another, the contradiction is minor and does not provide a basis to strike Meli's declaration altogether.  On the contrary, defendants argue that the core of Meli's testimony has remained consistent throughout, and that the trivial inconsistency as to whether Meli spoke to Billington before responding to Harris's request is irrelevant to resolving the pending motions for summary judgment.

While Meli's declarations are certainly contradictory, these actions do not justify striking his testimony in its entirety, nor do they justify holding Meli in contempt as Harris requested.  This conclusion might be different were the inconsistency itself relevant to the pending summary judgment motions.  But as defendants point out, the inconsistency has no bearing on the merits of *either* party's motion for summary judgment.  It certainly presents an opportunity to impeach Meli's credibility at trial, should either party wish to call him as a witness, and it may provide an additional source of support should Harris wish to renew his motion for spoliation sanctions before trial.  But it does not necessitate striking Meli's declarations altogether or holding him in contempt of court at this time.  Accordingly, Harris's motion to strike (dkt. #51) will be denied.

17

OPINION

The court has before it cross-motions for summary judgment.  As with any summary judgment motion, the court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party.  *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, in resolving defendants' motion, the court will credit Harris's version of the facts and draw all inferences in his favor; in resolving Harris's motion, the court will credit defendants' version of the facts and draws all inferences in their favor.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment."  *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  For an issue on which the nonmoving party will bear the burden of proof at trial, it is not sufficient for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, he must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  That is, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

18

## I. Defendants' Motion for Partial Summary Judgment

### A. Amy Radcliffe

Harris claims Amy Radcliffe acted with deliberate indifference to his serious medical needs following his self-injury on April 12 by placing him in control status, rather than observation status. "A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objectively, sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To satisfy the subjective component of deliberate indifference, a prisoner must demonstrate that the defendant "knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)).

As defendants emphasize, proving deliberate indifference is a difficult standard to meet, particularly when the theory is one of improper medical treatment. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole ex rel. Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).

Defendants first contend that no reasonable jury could find Harris was suffering from a serious medical need at the time of Radcliffe's examination. Viewing all the facts in the light most favorable to Harris, the court disagrees. "It goes without saying that '[s]uicide is a serious harm.'" *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (quoting *Estate*

19

*of Cole*, 94 F.3d at 261)).   "Suicide, attempted suicide and other acts of self-harm clearly pose a 'serious' risk to an inmate's health and safety."   *Goodvine v. Ankarlo*, 9 F. Supp. 3d 899, 934 (W.D. Wis. 2014); *see also Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").   Harris has offered his sworn statement that he explicitly informed Radcliffe that he was suicidal on April 12 and needed to go to observation.     Furthermore, Harris presented with more than just unsubstantiated complaints of feeling suicidal.   There appears no dispute that he presented after having beaten his head against the walls and door of his cell hard enough to cause nasal bruising, bleeding and nasal septal deviation.   In fact, crediting Harris's version of events (as the court must at this stage), Harris had beaten his head so hard that he lost consciousness. Even if this was not a suicide attempt, such violent self-injury and the potential for further comparable behavior could pose a "substantial risk to [Harris's] health or safety."   *Goodvine* 9 F. Supp. 3d at 934; *cf. Murphy v. Waller*, 51 F.3d 714, 719 (7th Cir. 1995) (per curium) ("An injury to the head unless obviously superficial should ordinarily be considered serious[.]").   A reasonable jury could thus find, based on the combination of Harris's self-assessment of his mental state and his relatively severe injuries,[3] that he had an objectively serious need for mental health care at the time Radcliffe examined him.

Defendants next argue that Radcliffe did not participate in the decision to place Harris in control status, meaning she was not personally involved in the deprivation that Harris alleges.   Defendants point to Radcliffe's contemporaneous notes, which indicate that

---

[3] Defendants concede in their brief that Harris's nasal injuries could potentially constitute a serious medical need.   (*See* Defs.' Br. Supp. Mot. Summ. J. (dkt. #59) 10.)   Harris has, however, brought no claim premised on inadequate medical treatment of those physical injuries.

Harris was going to observation, and to Radcliffe's testimony that she genuinely believed those notes.  In opposition, Harris claims that he overheard Lt. Bauer tell Radcliffe that Harris was to be placed in control status, rather than observation.  Defendants object to this out-of-court statement as hearsay, but Harris does not offer it for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).  Rather, he offers it to create a factual dispute as to what Radcliffe believed at the time, which "does not depend on the actual truth of the matters asserted in the [statement]." *United States v. Harris*, 942 F.2d 1125, 1130 (7th Cir. 1991).  Moreover, Radcliffe's reaction is not hearsay at all, but rather a statement by a party opponent.  Fed. R. Evid. 801(d)(2)(A).  Furthermore, Bauer's statement that Harris was going to control is not hearsay because:  (1) it is being offered against Radcliffe; and (2) she allegedly manifested her belief in its truth by asking Bauer if he was certain of his decision.  Fed. R. Evid. 801(d)(2)(B).  Additionally, Radcliffe had the authority to place Harris in observation, rather than in control status.  Crediting Harris's version of the facts, and drawing the reasonable inference that Radcliffe's authority extended to ordering Harris's placement in observation, as well as overruling Lt. Bauer's contrary decision for control status, a reasonable jury could find that Radcliffe was personally involved in the allegedly improper placement.

Finally, defendants argue that there is no evidence that the decision to place Harris in control, rather than observation, was so far afield of professional judgment as to constitute deliberate indifference.  They note accurately that Harris has offered no expert testimony regarding the reasonableness of placing him on control status, asking the court to conclude as a matter of law that Radcliffe's alleged placement decision was not so unreasonable as to constitute deliberate indifference.  Harris responds that well-established

21

DOC policy required his placement in observation, citing to Wis. Adm. Code § DOC 311.04:

> (1) Observation for mental health purposes is an involuntary or a voluntary nonpunitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or the safety of others.   An inmate may be placed in observation for mental health purposes for one of the following reasons:
>
> > (a) The inmate is mentally ill and dangerous to himself or herself or others.
> >
> > (b) The inmate is dangerous to himself or herself.

Moreover, the policy provides that an inmate is considered dangerous to himself if "there is a substantial probability that the inmate will cause physical harm to himself," as manifested by, among other signs, "[t]he reasonable belief of others that violent behavior and serious physical harm is likely to occur because of a recent overt act, attempt or threat to do such physical harm."  Wis. Adm. Code § DOC 311.04(3)(b).  Placement in observation results in a mandatory examination by a "clinician, crisis intervention worker or physician."  *Id.* at § DOC 311.05(1).

Given the high standard for establishing deliberate indifference, Harris must show more than "medical malpractice, negligence, or even gross negligence[.]" *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).  "Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient." *Id.*  Still, if a reasonable jury could find that Radcliffe knew such placement was *necessary* under the circumstances, but consciously disregarded that need, this could rise to the level of deliberate indifference. *See id.* ("It is not enough to show, for instance, that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then

consciously disregard that need in order to be held deliberately indifferent.").  A trier of fact may infer such knowledge "from evidence that the serious medical need was obvious."  *Id.* (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

The matter is complicated by the dispute of fact between Harris and Radcliffe.  As noted above, Harris swears he told Radcliffe that he was suicidal, pleaded to go to observation status and had severe physical injuries, while Radcliffe claims Harris said only that the self-harm had been a "suicidal gesture" and that her "multi-system assessment" showed Harris was not at imminent risk of further self-harm.  Crediting Harris's version of their conversation, DOC policy, as articulated in Wis. Adm. Code § DOC 311.04, at least strongly suggests that someone in his position should be placed in observation.  In the end, this court cannot completely discount the possibility that a reasonable trier of fact could find that Harris's need to be placed in observation, where he would receive a mental health evaluation from a clinician, was obvious, and that Radcliffe, as a registered nurse with years of experience, not only knew that, but deliberately lied about their conversation to justify Harris's placement in control.  Accordingly, although Harris may have a difficult time proving this claim at trial, a reasonable jury *could* find in his favor, and so Radcliffe's motion for summary judgment will be denied.

## B.  Captain Bauer

The court has already concluded in Section I.A, *supra*, that a reasonable jury could conclude Harris was suffering from a serious medical need on the night of April 12.  The only question for summary judgment is whether a reasonable jury could conclude Captain Bauer was deliberately indifferent to that need.  It is undisputed that Captain Bauer saw the

23

bloodied windows of Harris's cell and was informed that the blood came from an act of self-harm; he was also present when Harris allegedly told Radcliffe that he was suicidal and needed to go to observation.  Bauer nevertheless decided to place Harris in control status, arguably contrary to DOC policy, meaning Harris would not be closely monitored or seen by a clinician.  A reasonable jury could find based on the foregoing that Captain Bauer knew that Harris was at serious risk of self-harm but failed to take appropriate action to mitigate that risk by ordering an observation placement.[4]  Accordingly, for substantially the same reasons that Radcliffe is not entitled to summary judgment, the court will deny Captain Bauer's motion for summary judgment as well.

### C. Dr. Garbelman

Harris was next granted leave to proceed on a claim that Dr. Garbelman ignored his requests for treatment after he expressed suicidal ideation on April 12th and 14th.  It is now undisputed that Garbelman knew nothing of the April 12 incident until sometime after April 25, when Harris contends he wrote a letter expressing his displeasure with Dr. Grisdale.  Harris also conceded that he did not contact Dr. Garbelman regarding his suicidal feelings *before* injuring himself on April 12.  Based on the undisputed facts in the record, there appears to be no basis on which to find that Dr. Garbelman actually knew that Harris was at substantial risk of serious harm either before the April 12 incident or between April 18 and May 8, when Harris was finally seen by Dr. Grisdale.

---

[4] Generally, non-medical personnel are justified in deferring to the judgment of medical experts in the prison context.  *Greeno*, 414 F.3d at 56; *see also Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).  However, here, Bauer did not rely on Radcliffe's judgment, at least not according to Harris.  Rather *Bauer* made the decision to place Harris in control, saying there was "no need" for observation because Harris had not "cut on himself" and "look[ed] find to [him]."  *See* footnote 1, *supra.*

Harris attempts to preserve this claim by pointing out that Dr. Garbelman previously interviewed him at least twice -- on May 27, 2008, and March 28, 2012 -- for suicidal thoughts and self-destructive behavior.  Those interviews are not material, however.  The mere fact that Harris had previously exhibited suicidal ideation and behavior some weeks and years earlier does not mean that Dr. Garbelman knew that risk continued through April 26, the earliest he could have received Harris's letter.  Stated another way, Harris's *general* mental health problems do not, by themselves, make the risk of suicide so obvious that actual knowledge may be imputed to Dr. Garbelman absent some explicit communication of the risk *at the relevant time*, much less support a finding of deliberate indifference to that risk. *Cf. Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557-58 (7th Cir. 2003) (noting that "not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch" and declining to impute actual knowledge of risk based on depression and complaints of distress and "general malaise").

As noted above, it was not until April 26th at the earliest that Dr. Garbelman could have learned of Harris's dissatisfaction with the care he was receiving from Dr. Grisdale.  No reasonable jury could find Dr. Garbelman's failure to intervene at that time constituted a *deliberate disregard* of a serious medical need, because there is no indication that Harris's letter informed Dr. Garbelman that he was *still* at substantial risk of committing suicide. Indeed, Harris avers only that his letter informed Dr. Garbelman of the April 12 incident and complained about Dr. Grisdale's failure to respond to Harris's treatment requests.  No reasonable jury could infer that Dr. Garbelman's failure to intervene aggressively on that limited information constituted negligence, much less deliberate indifference.

25

## D. Dr. Grisdale

With respect to Dr. Grisdale, Harris essentially claims that Grisdale acted with deliberate indifference by ignoring Harris's repeated requests to be seen.  It is undisputed that Dr. Grisdale had no involvement in the decision to place Harris on control status and knew nothing either of Harris's suicidal ideation in the time immediately preceding his self-harm on April 12, nor was he notified that night of Harris's behavior despite being the on-call clinician that night.  Instead, the inaction for which Harris faults Dr. Grisdale appears to have begun on April 14, 2012.

The court agrees that Harris has produced sufficient evidence to create a genuine factual dispute as to whether Dr. Grisdale would have seen the PSR that Harris submitted on April 13.  WCI policy indicates that PSRs would have been routed to Dr. Grisdale as Harris's primary clinician.  A reasonable trier of fact could, therefore, infer that Dr. Grisdale had received and read the PSR based on that evidence.

There is also evidence that Harris asked to see Dr. Grisdale multiple times between April 17 and May 8, when Dr. Grisdale met him for an appointment.  Harris does not appear to object to the nature or quality of the treatment he received at that time; rather, his complaint centers on the *delay* he endured, which can, under certain circumstances, constitute deliberate indifference.  *See, e.g.*, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-72 & n.6 (7th Cir. 1997) (delays in treating painful medical conditions that are not life-threatening can support deliberate indifference claims); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (inmate stated a claim for deliberate indifference by alleging that "his 'pleas' for psychological treatment were 'ignored'").

26

In response, defendants argue that nothing in the record establishes that Harris had a *serious* medical need during the period of delay.  A medical need must be "sufficiently serious or painful to make the refusal of assistance uncivilized."  *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996).  "The need for a mental illness to be treated could certainly be considered a serious medical need."  *Sanville*, 266 F.3d at 734; *see also Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) ("Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need' under the *Estelle* formulation.").  "[T]here is no requirement that a prisoner provide 'objective' evidence of his pain and suffering – self-reporting is often the only indicator a doctor has of a patient's condition."  *Greeno*, 414 F.3d at 655.

During the time he was asking to see Dr. Grisdale, Harris reported feeling depressed and "more suicidal lately."  (*See* Harris Aff. (dkt. #56) ¶ 18.)  On the other hand, when Harris did eventually meet with Dr. Grisdale, his mental health examination was apparently within normal limits, and there is no suggestion that Harris engaged in any suicidal or self-harming behavior between April 17 and May 8.  While a close question, the court concludes that a reasonable jury could find that Harris was suffering from a serious medical need based on his self-reported mental state -- particularly in light of his relatively recent self-harm and history of mental health problems.  Of course, it may be difficult for him to *prove* that his need was objectively serious, particularly in light of the results of his eventual mental health examination, as well as contemporaneous notes by Nurse Clinician Radcliffe that no referral or follow-up was necessary and Dr. Baird's later notes that Harris *denied* suicidal ideation, but that is for a jury to decide.

Even if Harris had a serious medical need, defendants also argue that there is no basis to infer that Dr. Grisdale knew of that need.   Certainly, actual knowledge of the risk of suicide cannot be imputed based merely on a history of manic depression, a previous suicide attempt and general malaise.  *See Matos*, 335 F.3d at 557-58.  There is some evidence that, if credited, could establish that Dr. Grisdale knew facts suggesting a far more urgent need for treatment.   For instance, Harris has created a genuine dispute of fact as to whether Dr. Grisdale had access to the PSR describing his very recent self-harm (unlike the inmate in *Matos*, whose last suicide attempt had occurred three years before he actually committed suicide). Furthermore, Harris has averred that he expressly informed Dr. Baird on multiple occasions that he had been feeling depressed and "more suicidal lately."   There is also evidence from which a trier of fact could infer that Dr. Baird informed Dr. Grisdale of these conversations, although this, too, is undermined by Dr. Baird's contemporaneous notes that Harris denied suicidal ideation.  (*See* Jeffrey Garbelman Decl. Ex. 105 (dkt. #61-1) 000036 (entries for April 30 and May 7 reading "wants to see clinician (informed)").)

Finally, crediting Harris's version of the facts, when he *did* meet with Dr. Grisdale and asked him about the delay, Dr. Grisdale responded that he "didn't have time to babysit every inmate with emotional problems."   The cavalier nature of this alleged statement could provide at least some evidence that Dr. Grisdale "acted with a 'sufficiently culpable state of mind.'"  *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834)).   While this is a very close question, the court concludes that Harris has produced sufficient evidence for a trier of

28

fact to find in his favor, and so Dr. Grisdale's motion for summary judgment will be denied.[5]

## VII.   Plaintiff's Motion for Summary Judgment

As a preliminary matter, the court has already determined that defendant Dr. Jeffrey Garbelman is entitled to summary judgment.   Thus, Harris's own motion for summary judgment against that defendant will necessarily be denied.

### A.  Sgt. Eric Billington

Harris seeks summary judgment against Sgt. Billington, arguing that he deliberately disregarded Harris's threat to commit suicide.   Such a claim for failure to protect under the Eighth Amendment requires a showing that: (1) the harm facing the prisoner was objectively serious and a substantial risk to his health or safety; and (2) the defendant was deliberately indifferent to that risk.   *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006); *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992) (prisoners have a "right to be protected from self-destructive tendencies").

Unlike the summary judgment motion brought against Harris, however, Billington is now the *non*-movant and the court must construe all facts in *his* favor, rather than Harris's. *See Anderson*, 477 U.S. at 255.   Crediting Billington's version of the facts, Billington was never aware of Harris's suicidal behavior on the night of April 12, did not come to Harris's cell front, and had no warning before Harris engaged in self-destructive behavior.   If Billington did not know of a specific, serious risk that Harris posed to himself on April 12, he cannot be held liable for failing to take action to alleviate that risk under a deliberate

---

[5] The result might well be different had Dr. Grisdale asserted qualified immunity on summary judgment, but the court declines to make this argument for him.

indifference theory.  *See, e.g.*, *Haley v. Gross*, 86 F.3d 630, 640-41 (7th Cir. 1996) (discussing requirement that defendant actually know of substantial risk of serious harm).

In fairness, Harris argues that the court must disregard Billington's version of events because it is inconsistent with the record.  In support, he points to an Interview/Information request in which Harris complained of Billington's conduct.   The response, which is unsigned, reads:

> I talked with Sgt. Billington he said Harris called the bubble and said he wasn't feeling well.   When Sgt. Billington went to Harris['s] cell Harris would not talk to him when Billington asked what was wrong.

(Anthony Meli Decl. Ex. A (dkt. #35-1) 1.)   Harris contends that this response renders Billington's current story incredible.

Leaving aside the hearsay problem with Harris's response, Harris is really asking the court to credit his story over Billington's.   The court cannot make such credibility determinations on summary judgment -- not even when one version of events seems implausible, *see Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003), and not even when, as here, the contradictory evidence in question is self-serving.  *Id.* at 772.  Accordingly, Harris's claim against Billington must be left for a jury to decide.[6]

---

[6] Harris cites *Scott v. Harris*, 550 U.S. 372 (2007), for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380.  The record in *Scott* is readily distinguishable from that here, however.  In *Scott*, the non-movant's version of a car chase, in which he contended that he had driven in a controlled and careful manner, was blatantly discredited by a video of the chase that "more closely resemble[d] a Hollywood-style car chase of the most frightening sort[.]"  *Id.*  Here, there is no definitive evidence, video or otherwise, on which the court can rely.

## B. Todd Russell

Harris's claim against Todd Russell suffers from the same defect as his claim against Billington.  According to Russell, neither Harris nor any other inmate pressed his emergency call buttons on the night of April 12.[7]  As does Billington, Russell maintains that he had no warning that Harris was suicidal before Harris began to bang his head and face against his cell walls.  As discussed above, a lack of actual knowledge is fatal to any claim for deliberate indifference.  *See Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 788-89 (7th Cir. 1995) (discussing knowledge requirement of deliberate indifference).  Also as above, the court cannot usurp the jury's role by crediting one version of the facts over the other, even if one party's story seems more credible or likely.  *Payne*, 337 F.3d at 771.   For these reasons, Harris is not entitled to summary judgment against Russell.

## C. Amy Radcliffe

Harris also moved for summary judgment against Radcliffe, but viewing the facts in the light most favorable to *her*, he again falls far short of meeting his burden.  According to Radcliffe, on the night of April 12, Harris never informed her that he was suicidal and needed to go to observation status.  Most importantly, according to Radcliffe, she *genuinely believed* that Harris had been placed in observation status, as reflected in her contemporaneous notes.  If a jury were to credit Radcliffe's version of events, it would effectively be *required* to find that she had not behaved with deliberate indifference, since she could not have the necessary state of mind.  *See Farmer*, 511 U.S. at 837 (to be liable for deliberate indifference, official "must both be aware of facts from which the inference could

---

[7] Harris points to an apparent mistake in Russell's interrogatory responses as constituting an admission that Harris did press his emergency call button (*see* Ex. 3 (dkt. #57-1) ECF 15), but the court declines to grant Harris summary judgment based on a typographical error.

be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). Thus, Harris's motion for summary judgment on his claim against Radcliffe must also be denied.

### D. Captain Bauer

Harris next moved for summary judgment against Captain Bauer. However, viewing all the facts in the light most favorable to Captain Bauer as the non-movant, a reasonable jury could also find for Captain Bauer. According to Captain Bauer, (1) he never saw that Harris had a sheet around his neck *and* (2) he was unaware that Harris was feeling suicidal after receiving treatment from Radcliffe. Indeed, he asserts that Harris never asked to speak with a psychologist or member of the PSU staff, and that Radcliffe concluded through her multi-system assessment Harris was not at imminent risk of suicide. A jury crediting this testimony could conclude that Captain Bauer believed -- even if incorrectly -- that Harris was not at substantial risk of serious harm, which would undermine any claim for deliberate indifference. *See Farmer*, 511 U.S. at 844 (to defeat liability, prison officials might show "that they did not know of the underlying facts indicating a sufficiently substantial danger . . . or that they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent").

### E. Dr. Grisdale

Finally, Harris moved for summary judgment against Dr. Grisdale. As with Harris's claim against Radcliffe, when viewing the facts in the light most favorable to Dr. Grisdale as the non-movant, Harris cannot meet his burden on summary judgment. According to Dr. Grisdale's version of events, he never read the PSR Harris submitted on April 13, detailing

the previous night's self-harming behavior.  (Charles Grisdale Decl. (dkt. #62) ¶ 16.)  In the days that followed, he also maintains that Harris repeatedly *denied* suicidal ideation and did not engage in any further self-harming behavior.  Moreover, Grisdale points out there is no evidence that Harris used the prescribed procedures at WCI to access Psychological Services by contacting security to request an intervention.  Finally, when Harris was eventually seen, Dr. Grisdale maintains his mental health was within normal limits, suggesting he may not have had a "serious medical need" at all during that time period.

For all these reasons, a jury could find that Dr. Grisdale did *not* act with the necessary "culpable state of mind," and so Harris's motion for summary judgment against Grisdale must also be denied.

ORDER

IT IS ORDERED that:

1) Plaintiff Carl T. Harris's motion to strike (dkt. #51) is DENIED.

2) Plaintiff's motion for summary judgment (dkt. #54) is DENIED.

3) Defendants' motion for partial summary judgment (dkt. #58) is GRANTED IN PART and DENIED IN PART, consistent with the opinion above.

4) Plaintiff's motion for summary judgment against defendant Captain Wayne Bauer (dkt. #89) is DENIED.

5) Defendant Bauer's motion for summary judgment (dkt. #95) is DENIED.

6)  A telephonic status conference will be held Wednesday, April 29, 2015, at 10:00 a.m., defendants to initiate the call to the court.

Entered this 24th day of April, 2015.

                                        BY THE COURT:

                                        /s/
                                        _____
                                        WILLIAM M. CONLEY
                                        District Judge